MARC F. BROTMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brotman v. Commissioner
Docket Nos. 3859-74, 10596-75 10597-75
United States Tax Court
T.C. Memo 1977-65; 1977 Tax Ct. Memo LEXIS 377; 36 T.C.M. (CCH) 279; T.C.M. (RIA) 770065; March 14, 1977, Filed Marc F. Brotman, pro se. Arthur H. Boelter, for the respondent. WILBUR
MEMORANDUM *378 FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined the following deficiencies in petitioner's Federal income tax: Sec. 6653(a) [1] Year
Deficiency
Addition
1971
$2,151.50
$107.57
1972
986.11
1973
1,114.00
The controversy presents the following issues for our decision: (1) Whether petitioner had unreported gross receipts of $5,091 in the tax year 1971. (2) Whether petitioner is entitled under section 167 to claim depreciation for 1971, 1972, and 1973 in the amounts shown on his return. (3) Whether petitioner is entitled to deduct the legal fees attributable to his divorce under section 162 or 212. (4) Whether petitioner is entitled to deduct, in 1971, as charitable contributions under section 170, certain tuition payments and payments to a rabbi. (5) Whether petitioner is entitled to deduct business expenses for the years 1971, 1972, and 1973 in excess of those allowed by the Commissioner. (6) Whether petitioner is to be charged with a negligence penalty under section 6653(a). [2]
*379 Many of the facts have been stipulated and are found accordingly. Petitioner, Marc F. Brotman, filed his individual Federal income tax returns for the calendar years 1971, 1972, and 1973 with the district director of internal revenue at Brooklyn, New York. At the time the petition was filed in this case, petitioner resided in Brooklyn, New York. Petitioner, in the years in question, was self-employed as an accountant. The primary source of petitioner's income in these years was from the preparation of income tax returns. Issue 1. Unreported Gross Receipts in 1971
FINDINGS OF FACT On his 1971 return, petitioner reported gross receipts of $9650. In the deficiency notice, respondent determined that petitioner's gross receipts were $15,277, by recomputing gross receipts on the basis of bank deposits as follows: Deposits into checking accounts
$20,972
Additional cash income not deposited
Business
2,639
Personal
790
$24,401
Less: Transfers
$7,014
Redeposits
2,110
9,124
$15,277
Gross receipts
Reported
$9,650
Dividends
150
9,800
Unexplained deposits
$ 5,477
The transfers represent checks written on one of petitioner's *380 three bank accounts for deposit in another account. Respondent gave petitioner full credit for all of the interaccount transfers in 1971. The redeposits represent credits for all checks written to petitioner or to cash. Respondent allowed these credits on the basis of petitioner's assertion that he redeposited all of these amounts. At trial, respondent conceded that petitioner had satisfactorily explained an additional $386, leaving $5,091 in dispute. OPINION Petitioner, although an accountant, introduced no books and records at trial from which the gross receipts from his business of preparing income tax returns could be computed, and we believe the respondent's use of the bank deposit method was entirely justified. Petitioner claimed that he was going through a divorce and was worried that his wife, a school teacher, would acquire his accounting practice. Therefore, according to petitioner, he drew checks payable to himself equal to between $2,000 - $2,500 and cashed them. In spite of being warned by his friends that carrying this much cash was extremely dangerous, petitioner claimed he regarded this cash as his "security blanket." Even if this story were true (about *381 which, to put it euphemistically, we entertain grave doubts), it avails petitioner nothing. Respondent assumed petitioner redeposited all amounts attributable to checks made out to himself, even though petitioner admitted at trial that some of this money was spent rather than redeposited. Respondent, therefore, went the extra mile and then some to avoid any duplications in his reconstruction of income. Petitioner attempted to avoid these facts by confusing the separate items in respondent's recomputation for transfers between accounts, and the checks petitioner made out to himself and cashed. But as the stipulation makes clear, these items are quite different and petitioner conceded at trial that he was given complete credit for inter-account transfers. It is also clear that the checks made out by petitioner to himself correspond roughly to the amount petitioner claimed to carry around in cash, and respondent eliminated these amounts as "redeposits" from his reconstruction of petitioner's income. Thus, even if petitioner's story is true, which we doubt, he understated gross receipts by the amount respondent claims. Issue 2. Depreciation
FINDINGS OF FACT During 1971, 1972, and *382 1973, petitioner resided alone at 413 Quentin Road, Brooklyn, New York. Petitioner's aunt and mother were co-owners of the property, a private residence. On May 10, 1972, petitioner's aunt deeded to petitioner her one-half interest in the Quentin Road property. During the years in question petitioner paid no rent for his occupancy of the residence. The Quentin Road property is a two-story stucco dwelling with 3 rooms on the first floor (including a kitchen), 3 bedrooms on the second floor, and a basement. In the beginning of 1971 petitioner, on a self-employment basis, began preparing income tax returns for individuals. In 1971 he had approximately 20 medical interns and medical residents as clients, and 15 other individuals. Additionally, during that year and during some of the later years in issue, he sent out a substantial number of letters soliciting the business of other physicians.Files in connection with petitioner's business of preparing income tax returns were retained in the Quentin Road residence. Petitioner also had an office in the dining room of the residence. OPINION Petitioner claimed depreciation on his income tax returns for 1971, 1972, and 1973, of *383 $2,000 in each of the 3 years in issue. [3]
Respondent disallowed all of the claimed depreciation throughout 1971 and for the period through May 10, 1972, when petitioner acquired his aunt's one-half interest in the premises. During this period of time, petitioner had no ownership interest in the premises on which he claimed depreciation, and therefore was not entitled to any deductions for depreciation. Subsequent to May 10, 1972, petitioner was allowed depreciation by respondent based on respondent's determination that the premises were used one-third for business, that they had a useful life of 40 years, and that petitioner's basis for depreciation was $25,000. [4] On this basis, respondent disallowed $1,945 of the depreciation in 1972 and $1,800 of the depreciation in 1973. Respondent's allowance of depreciation based on one-third business use is generous on the record before us. There is no evidence *384 in the record that would warrant our concluding that his estimate that the home was worth $25,000 when petitioner acquired his one-half interest in 1972 and had a useful life of 40 years, was erroneous. Although petitioner testified that the home was worth $45,000, and that it had a useful life of 10 years, his testimony was most unconvincing and wholly uncorroborated. He claimed that the short life he attributed to the residence was justified because it was in need of repairs. Yet the only repair he specified as being needed was painting, which would only have marginal effect, if any, on useful life. The house was subsequently painted and petitioner stated that it greatly increased its useful life. We had a chance to observe petitioner, and find his testimony confused and wholly unconvincing on this issue. Issue 3. Deductibility of Legal Expenses Attributable to Divorce
FINDINGS OF FACT Petitioner claims a deduction for $1,000 paid in 1971 and $150 in 1972 for legal fees attributable to petitioner's divorce. [5] Petitioner at first was reluctant to secure the services of an attorney. However, he subsequently became concerned about the impact his former wife's financial *385 claims might have on his business. He therefore secured the services of an attorney. A letter from the attorney, which was included in the stipulation, stated: This action was not the usual type of divorce, even though it was not going to be contested. His wife wanted from him aside from the usual items of child support, etc., his automobile which he used to travel to his many clients, the names of all of his clients, and other assets used and needed by him in the conduct of his business. OPINION Petitioner contends that he was afraid he would lose his automobile which was needed for business, and that his wife, a schoolteacher, would acquire an interest in his accounting practice that would deprive him of the opportunity to earn a living. Petitioner's assertion in this regard is attenuated, and we do not find his testimony credible. However, even if petitioner's factual assertions were believed in their entirety, this issue is controlled by United States v. Gilmore,372 U.S. 39 (1963). On far stronger facts than exist in the present case, the Supreme Court held that *386 it is "the origin and nature of the claims themselves" that determine whether an item may be deducted as an ordinary and necessary business expense. Id. at 44. The Court made it clear that, on facts like those before us, the taxpayer has incurred a personal expense under section 262 that may not be deducted. Issue 4. Charitable Contribution
FINDINGS OF FACT On his 1971 income tax return petitioner deducted $582 as a charitable contribution deduction.The amounts deducted and allowed are as follows: Deducted
Allowed
Ocean Pkway Jewish Center $211
$ 75
Rabbi A. Morgenstern
125
Congregation
21
21
Salvation Army
150
150
Estimated Cash
75
50 $582 $296 Payments to the Ocean Parkway Jewish Center in excess of $75 were billed to petitioner by the Ocean Parkway Jewish Center as tuition for his son David's attendance at Hebrew School. The payment of $125 to Rabbi A. Morgenstern was for his attendance at petitioner's divorce in 1971. OPINION Petitioner's payment to Rabbi A. Morgenstern was for a personal expense under *387 section 262. Expenses incident to divorce are no less personal when paraded forth as a charitable deduction than when claimed as a business expense. Similarly, tuition payments on behalf of petitioner's son are a personal expense, even though the school providing the educational instruction may have been tax exempt. The charitable deduction petitioner claims in excess of that allowed by respondent must be disallowed under section 262. Issue 5. Business Expenses
FINDINGS OF FACT Petitioner claimed the following business expenses during the years in issue: 1971
1972
1973
Client Conference,
Promotion & New
Client Development
$1,681
$2,229
Utilities $386
135
265
Postage
1,464
2,238
Telephone
220
Office Expenses
257
468
The expenditures for client conference and promotion in 1972 were for two trips petitioner made to California. The first trip, in early October 1972, was part of a group travel organized by the Rosedale Jewish Center. The second trip occurred in late November and early December of 1972. In 1972, petitioner also prepaid expenses for a group travel trip to California taken in 1973.The prepaid expenses *388 were made to a group called Parents Without Partners. Respondent has disallowed portions of the above expenditures. Substantiation has been virtually eliminated as an issue. However, respondent contends that petitioner has not demonstrated that the amounts substantiated were for business as opposed to personal purposes. OPINION Petitioner testified that he enjoyed the warmer California weather, hoped to eventually locate on the West Coast, and had visited a relative in California. His trips were apparently part of a group tour, and we conclude that they were undertaken principally for personal enjoyment. Petitioner considered himself an expert on the taxation of grants received by residents and interns and did apparently attempt to compile lists of medical residents at certain California hospitals. [6] Nevertheless, petitioner scheduled no appointments prior to leaving for California, had no business schedule, and was unable to specifically detail any business activity conducted while in California. We conclude that his trips are personal expenses, and that section 262 precludes their deduction as business expenses under section 162. *389 Petitioner introduced receipts for the purchase of stamps. However, he concedes that some of the stamps were used for personal mail, and there is nothing in the record to systematically account for the proportion used for business. Additionally, some of the payments were made to the philatelic sales unit. Petitioner contends that physicians, who are the principal object of his solicitations, are more likely to open a letter posted with a commemorative stamp of philatelic quality. This explanation, not entirely satisfactory in itself, is even less satisfying in view of petitioner's testimony that he was a philatelist as an adolescent. We simply do not believe petitioner has substantiated expenditures for stamps for his business in excess of the substantial amount respondent allowed. [7]
The remaining items include telephone, office, and utility expenses. Again, these involve expenses for items that can be personal or business expenses, depending on the context. The allocation made by respondent is consistent with the allocations he has made on other items. We also believe that the general deduction *390 for office expenses involves some duplication of items specifically deducted. We therefore conclude that petitioner has not demonstrated that he incurred any business expenses for these items in excess of amounts already allowed by respondent. Issue 6. Negligence Penalty
FINDINGS OF FACT AND OPINION Respondent assessed a penalty of $107.57 under section 6653(a). The relevant portion of that section provides: (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. It is hard to conceive of a case where the penalty would be more clearly applicable. Petitioner is in the business of preparing tax returns and is an accountant. He deducted a number of personal expenses--including *391 payments to the rabbi and legal expenses incident to a divorce that he may well have known were not deductible. In any event, with very little effort, he could have learned that these expenses were not business expenses or charitable deductions. We therefore feel the penalty is completely justified and sustain respondent on this point. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Medical and dental expenses disallowed for 1971, 1972, and 1973 are simply statutory adjustments based upon the increase in petitioner's adjusted gross income.↩
3. Petitioner actually claimed the $2,000 for rent on his 1971 return. However, at trial he indicates this was a mistake, and it was intended to be depreciation.↩
4. Petitioner's depreciation was adjusted to reflect the fact that he only owned one-half of the property.↩
5. Petitioner claimed $1,350 for legal fees in 1971, but only substantiated $1,000.↩
6. Petitioner sent out the following letter: Dear Doctor: A colleague of yours has referred your name to me at my request with the hope that I may assist you with your tax planning and tax work. I have had more than fifteen years of tax experience for individual taxpayers, and my aim has been for the individual to retain more of his earnings via proper, early tax planning. I decided to work more closely with the medical profession some years ago, and have researched the Internal Revenue Code with the idea of being more helpful to doctors than in the past. I have researched sections of much value to interns, residents and doctors in their own practices, whereby these doctors may reduce their taxable income by $3,600.00 plus. This may be done by citing the Internal Revenue Code sections plus the applicable paragraphs. As each taxpayer's circumstances differ, it was necessary for me to meet with each doctor, review the facts and determine whether these facts, as presented, would fit the Internal Revenue Code Regulations. Most of the taxpayers' facts brought them under the regulations and I have had much success with it these past years. I also checked prior years' codes and found that these regulations were in effect in prior years. This means that amended returns may be filed for three prior years, saving taxpayers more money. If you think my assistance would be beneficial to you, please enter the applicable information on the enclosed card and mail it to me, in order that we may arrange a mutually convenient appointment to discuss your tax structure and plan as early as possible for your best interests. I hope to hear from you shortly. Sincerely yours, Marc F. Brotman↩
7. Respondent allowed petitioner $600 in 1972 and $1020 in 1973 for stamps.↩